KENNETH FRUCHT,  State Bar No.  178881
FREDERICK J. GEONETTA,  State Bar No.  114824
**GEONETTA & FRUCHT, LLP**
825 Washington Street, Suite 220
Oakland, CA  94607
Telephone:  (510) 254-3777

Attorneys for Plaintiffs Fadi Saba and Chih Lin

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FADI SABA, CHIH LIN,<br><br>        Plaintiffs,<br><br>    v.<br><br>KENSINGTON POLICE PROTECTION AND COMMUNITY SERVICES DISTRICT, RICKY HULL, MANNY RAMOS, RODNEY MARTINEZ, KEITH BARROW, THEODORE FOLEY, and DOES 1-25, inclusive,<br><br>        Defendants. | **CASE NO.:**<br><br>1.  **18 U.S.C. §1961 *et seq.* RICO Violations**<br>2.  **42 U.S.C. §1983 – Unreasonable Search and Seizure**<br>3.  **42 U.S.C. §1983 – False Arrest and Imprisonment**<br>4.  **42 U.S.C. §1983 – Malicious Prosecution**<br>5.  **False Arrest**<br>6.  **Negligent Hiring, Training and Retention**<br>7.  **Malicious Prosecution**<br>8.  **Defamation**<br>9.  **Intentional Infliction of Emotional Distress**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Fadi Saba ("Saba") and Chih Lin ("Lin") allege and complain against

Defendants, Kensington Police and Community Services District, Ricky Hull, Manny Ramos,

Keith Barrow, Rodney Martinez, Theodore Foley and Does 1-25, inclusive, as follows:

### JURISDICTION AND VENUE

1.      This is a civil rights action and this Court has original jurisdiction pursuant to 28

**1**

U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983.  The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

2.      Venue is proper in the Northern District of California under 28 U.S.C. 1391(b) because a substantial part of the events or omissions giving rise to the claims in this action occurred within this District.

3.      To the extent that Plaintiffs are required to comply with provisions of the California Government Tort Claims Act, Plaintiffs have each complied by filing timely claims, both of which were rejected on August 16, 2017.

<u>PARTIES</u>

4.      Plaintiff Fadi Saba ("Saba") was at all times relevant herein, a resident of Kensington, California.

5.      Plaintiff Chih Lin  ("Lin") was at all times relevant herein, a resident of Kensington, California.

6.      Plaintiffs are informed and believe and thereupon allege that Defendant Kensington Police Protection and Community Services District ("Kensington District") is and was at all times relevant herein a California public entity, duly organized and existing under the law of the State of California. and responsible for the operation, management and control of the Kensington Police Department and/or the hiring, supervision, training, discipline and management of the sworn members of the Kensington Police Department. The Kensington District is organized under the Community Services District Law (Gov. Code § 61000 *et seq.*), and is governed by a board of directors consisting of five board members.

7.      Plaintiffs are informed and believe and thereupon allege that Defendant Ricky Hull ("Hull") was at all times relevant herein a "Master Sergeant" and also the Interim or Acting Chief of the Kensington Police Department and in that capacity served as the supervisor of other members and officers of the Kensington Police Department.  Hull also served as the General Manager of the Kensington District.  At all times mentioned herein, Hull was acting under color of state law during the relevant acts and omissions alleged, and he is sued in both his individual

COMPLAINT FOR DAMAGES
SABA v. KENSINGTON, Case No. _____

and his official capacities.

8.     Defendant Manny Ramos ("Ramos") was at all time relevant herein a member of the Kensington Police Department.  He is sued in both his individual and his official capacities.

9.     Defendant Keith Barrow ("Barrow") was at all time relevant herein a member of the Kensington Police Department.  He is sued in both his individual and his official capacities.

10.     Defendant  Rodney Martinez ("Martinez") was at all time relevant herein a member of the Kensington Police Department.  He is sued in both his individual and his official capacities.

11.     Defendant  Theodore Foley ("Foley") was at all time relevant herein a member of the Kensington Police Department.  He is sued in both his individual and his official capacities.

12.     Plaintiffs are ignorant of the true names and capacities whether. individual, corporate or otherwise, of DOES 1-25 herein and prays leave of the Court to insert the true names and capacities of such Defendants when they become known or are ascertained, together with appropriate charging allegations.

13.     Plaintiffs are informed and believe and thereon allege that at all times relevant herein, each of the Defendants was the agent, employee or representative of each of the other Defendants, and in doing the things herein mentioned were acting in the course and scope of such agency and employment. It is further alleged that in doing the acts or omissions complained of herein, the Defendants, and each of them, acted or omitted to act in concert as agents of and/or on behalf of the other Defendants, and authorized, ratified, and aided and abetted the doing of each of the acts alleged herein.  In so acting, the Defendants, and each of them, proximately caused Plaintiffs' damages as alleged herein.

## FACTUAL ALLEGATIONS

14.     Kensington is a small, unincorporated community located in the East Bay hills between Berkeley and El Cerrito, with a population of about 5,000. Kensington maintains its own police department, which is governed by the Kensington District.

15.     The Kensington District is governed by a five-member Board, and the day to day

COMPLAINT FOR DAMAGES
SABA v. KENSINGTON, Case No. _____

operations of the Kensington Police Department are managed by a Chief of Police. Up until June 2017, the Chief of Police also held the job of General Manager of the District.  The position of Chief of Police and General Manager were held by Greg Harman until 2015.  At that time Harman was terminated after his failure to timely investigate and deal with a scandal involving Kensington Police Department officer Keith Barrow, whose gun, badge and handcuffs were stolen by a prostitute in Reno, Nevada.

16.     Plaintiffs are informed and believe and thereupon allege that prior to Harman's termination as Chief of Police, there were complaints alleging that Kensington Police Department officers had harassed Kensington residents and Board members who criticized the Kensington Police Department's leadership.  In 2012 for example, Cathie Kosel, a Kensington resident and Kensington District Board member, accused Hull of trying intimidate her by racing his car towards her at high speed.  Kosel had confronted Harman at a previous board meeting about allegedly improper use of Kensington District credit cards.  While Hull denied the charge and an investigation found insufficient evidence to support Kosel's allegations, Hull later joked to Saba about trying to run over Kosel. Plaintiffs are informed and believe and thereupon allege that Hull attempted to intimidate Kosel because of her criticism of Kensington Police Department leadership.  Plaintiffs are further informed and believe that the Kensington District Board was  aware that Hull had a history of aggression.

17.     In or about December 2010, Plaintiffs moved with their children to the Bay Area, and within several months purchased a home in Kensington, California. Between 2010 and 2017 they made extensive remodeling improvements and investments in their home to accommodate a growing family.

**The Summer Camp Incident**

18.     Saba initially had positive and friendly experiences with members of the Kensington Police Department. The realtor that sold Plaintiffs their home was friends with, and introduced Saba to, Kensington Police Department Officer Kevin Hui, who was also a neighbor. Indeed, on several occasions Hui helped Plaintiff Lin and friends and family members take care

COMPLAINT FOR DAMAGES
SABA v. KENSINGTON, Case No. _____

of traffic tickets. Saba has generally enjoyed good relations, and has socialized and eaten meals, with a number of Kensington Police Department officers.

19.     In or about June 2012, Plaintiffs' 5-year old son Nathan attended a summer camp run by the Kensington Community Council.  Nathan was signed up for the summer, but during the first week of the camp some of the counselors acted physically and verbally inappropriately towards Nathan.  The behavior included racially inappropriate comments as well as one incident where a counselor picked Nathan up, suspended him upside down, and slapped him on his behind. Nathan was humiliated and uncomfortable with the counselors' behavior and was crying one day when he was picked up, and as he told his parents about what had happened.

20.     After learning of Nathan's problems at the camp, Saba took his son out of the summer program, and approached camp administrator Marty Westby ("Westby") to complain about the name calling and the inappropriate physical contact with Nathan. Westby didn't take Saba's complaint seriously. Saba also had email exchanges with Westby, and inadvertently sent one of them to all of the camp parents, some of who reacted negatively toward Saba.  One parent later showed up at Saba's home and threatened him.

21.     Because of the replies he had received to the email he inadvertently sent to all of the camp parents, and then went to the police station to speak to Hui.  Later, at the urging of Hui, Saba contacted and reported the camp incidents to the Kensington Police Department ("Kensington Police Department").  The investigation of Saba's complaint about the camp went through several different Kensington Police Department officers.  Kevin Hui initially went to speak to the counselor who had harassed Saba's son, and the counselor's mother responded by hiring an attorney.

22.     The responsibility for investigating Saba's complaint eventually fell to Hull. At some point Saba wrote an email to Hull about the threatening visit he had received from the camp parent, but Hull did not respond or follow up. Instead, he asked Saba to come down to the station to talk. When Saba arrived, Hull met him and asked him to "drop it" [his complaint] as a "personal favor."  Hull then took Saba into a conference room and they sat across from each

other at a table. Hull asked Saba to explain his complaint once again. After Saba was finished, Hull pulled out a gun, placed it on the table facing Saba, and said "This can end in one of two ways…" Saba was shocked and frightened. He said to Hull "why did you do that? What does that mean? Is that a threat?" Hull shrugged and, when he didn't respond, Saba rose and walked out of the room and left. Plaintiffs are informed and believe and thereupon allege that Hull intended Saba to take the gun on the table as a threat to drop his complaint against the counselor and the camp.

23. Saba was very disturbed after the gun incident. However, when he called Kevin Hui and told him what happened, Hui convinced Saba not to go outside the Kensington Police Department, and assured Saba that he himself would investigate Hull's threat and conduct.

24. In response to Saba's complaint, Hull did something that he would later do again under different circumstances. He spoke to Westby and tried to convince her to take out a restraining order against Saba. Westby refused and told Hull it wasn't necessary. At a later time, Hull told Saba that he had spoken to Westby about getting a temporary restraining order ("TRO") against him, and that he (Saba) was "lucky" because she didn't want to do it, and because Hull knew that a restraining order could affect Saba's work security clearance. Hull knew about Saba's security clearance because Saba had gone to Hui to get finger prints for a security clearance he needed for a project he was working on in Minneapolis.

25. On or about July 13, 2012, Hull and Hui gave Saba a brownie to celebrate Hui's birthday. Unbeknownst to Saba, the brownies contained marijuana. Saba had a severe reaction and ended up in the hospital. Hull and Hui covered up the incident, took no action, and refused to file a police report concerning the incident. Plaintiffs are informed and believe and thereupon allege that the marijuana was taken from evidence collected and held by the Kensington Police Department.

## The Tree Incident

26. Plaintiffs had good relations with their neighbors Muwaffaq and Barbara Fattah (collectively "Fattahs"). During a major storm in November 2013, branches from a tree located

on Plaintiffs' property broke off and fell onto Plaintiffs' and the Fattahs' property and the property. The Fattahs' fence was damaged, and they also claimed there was damage to their roof. On the night of the storm, Muwaffaq Fattah came to Saba's house looking from him, but Saba was out of the country at the time, and they spoke to the babysitter who was at the house at the time. Muwaffaq Fattah told the babysitter that he had spoken to his insurance company and his lawyer, who had told him that he needed to prove that Plaintiffs were negligent in order to hold them liable to pay for the damage.

27.     Later, Saba walked over to the Fattahs' house to bring a piece of mail that had been incorrectly delivered to Plaintiffs' house. Muwaffaq Fattah was still upset about the tree, and demanded that Saba cut down the whole tree. Saba wanted to keep the tree as it provided shade for his children when they played outside. At some point Muwaffaq Fattah pushed Saba, and Barbara Fattah called the police. Kensington Police Department Officer Turner showed up and spoke to Saba and to Muwaffaq Fattah, who acknowledged shoving Saba. Turner asked Saba if he wanted to press charges against Muwaffaq Fattah, and Saba said he did not. At that point Hull arrived, and tried to stir up trouble, to Plaintiffs' detriment.

28.     Hull first spoke to the Fattahs and falsely told them that Saba wanted to make a citizen's arrest. Based on his false representation, Hull convinced Muwaffaq Fattah that he should take out a temporary restraining order against Saba. Next, Hull walked over to Saba's house and told Saba that Muwaffaq Fattah intended to obtain a TRO against him, and therefore Saba should make a citizen's arrest. Relying on Hull's representation, Saba agreed and Muwaffaq Fattah was cited by Hull. Shortly thereafter, Saba was served with a TRO.

29.     Plaintiffs are informed and believe and thereupon allege that Hull's representations to the Fattahs and Saba were intentionally false, and made solely for the purpose of creating conflict between Saba and the Fattahs. Specifically, they were intended to cause harm and annoyance to Saba, as the restraining order that Hull encouraged Fattah to obtain prevented Saba from occupying most of his own home, and accordingly Saba had to stay away from his home while the TRO was in effect and until the hearing on the restraining order took

place. Plaintiffs are further informed and believe and thereupon allege that Hull's conduct in this instance was intended to harm Saba in his profession. Hull knew that Saba needed a security clearance for his work, and also knew that a restraining order listed in the CLETS[1] database could impact a person's security clearance, and possibly cost them their job. Fortunately, the judge who presided over the hearing on the restraining order entered a non CLETS order requiring both sides maintain good behavior for six months. The non CLETS restraining order ensured that it didn't place any restrictions on Saba, was not entered into the national law enforcement database, and was not enforceable by law enforcement agencies.

30.     Hull prepared a police report regarding the tree incident. In his report he falsely accused Saba of calling him on the phone and trying to persuade him to alter his police report. Saba was disturbed that he was being accused of trying to obstruct and influence a police officer, and he politely asked Hull to retract the error. When Hull refused, Saba wrote emails to Chief Harman complaining about Hull's false police report and demanding it be corrected.

31.     Against Saba's wishes, Harman began a formal investigation into Saba's complaint, and met with Hull and Saba. During the meeting Saba said that Hull had to stop lying, and demanded that Hull's report be corrected to remove the false statement about the phone call. Saba told Harman during the meeting that Hull should be fired, and he later sent Harman a copy of the statute that makes it a crime to file a false police report. Hull was smug during the meeting and acted as if it the whole thing were a joke.

32.     Kevin Hui was assigned to investigate Saba's complaint against Hull, even though he was good friends with Hull. Hui subsequently told Saba that he was conflicted in his role investigating his friend. He also told Saba that he believed Saba's version of what had happened, and that Hull had refused to cooperate with the investigation or provide evidence that Saba had called him and asked him to alter the police report.

33.     Plaintiffs are informed and believe and thereupon allege that following Saba's

---

[1] CLETS stands for the "California Law Enforcement Telecommunications System." A CLETS TRO will appear in national law enforcement databases, and allows an officer to take action to enforce the TRO.

complaints against him, Hull became determined to find a way to retaliate against Saba. During a meeting of the District board of directors that Saba attended, Manny Ramos asked to meet with Saba privately.  When they met later at a Thai restaurant, Ramos warned Saba that Hull had issues with him, and was out to get him.  Specifically, Hull had told Ramos that he wanted to find an excuse to obtain a warrant to search Plaintiffs' home, and find a gun during the search and shoot Saba.  Hull also told Ramos that he was going to cause Saba to lose his job.  Hull knew that Saba had, and needed a security clearance for his work, and he also knew that an arrest and/or conviction would severely compromise Saba's ability to work in his profession.

34.    Saba was similarly told by Hui that Hull was extremely angry and was coming after him.

35.    Plaintiffs are informed and believe and thereupon allege that after Hui's investigation, and at the direction of then Police Chief and City Manager Harman, Hui instructed Hull to have no contact with Saba or his family.  Plaintiffs are informed and believe that the Kensington District knew or should have known that Harman had ordered such instructions be given to Hull.

**The Arrest**

36.    Between 2014 and the end of 2016, a number of circumstances coalesced in Kensington to put Defendant Hull in a position to execute his threats against Saba.

37.    In or about May 2014, Kensington Police Department Officer Keith Barrow's gun, badge and handcuffs were stolen by a prostitute in Reno, Nevada, and the theft was discovered after the prostitute's pimp shot himself in the leg with Barrow's gun the following day.

38.    Though Chief Harman knew about the incident shortly after it happened, Barrow's conduct in Reno was a serious offense and dereliction of duty.  Harman nevertheless allowed him to stay on active duty without taking any serious action against him for eight months, and Harman also hid the incident from the community.  After the incident became public in or about February 2015, Harman was fired, and he left the job in May 2015.  Barrow

was not fired, and was still working his job as of the end of 2017.  Harman was replaced by Interim Chief and General Manager Kevin Hart.  Hart himself was caught up in controversy and resigned in October 2016, after two officers – Barrow and Ramos - were alleged to have harassed District Director Vanessa Cordova during a traffic stop.  Hui allegedly leaked details of an internal affairs investigation and, on information and belief, was terminated for the leak.  Additionally, on information and belief, Ramos was investigated for improperly accessing DMV records of Kensington District Board members, and others.

39.     Hart was replaced as Interim Chief and General Manager by Kevin Kyle – who abruptly resigned weeks later.

40.     On or about December 2016, the Kensington District voted to appoint Hull as the Interim Chief and the Interim General Manager.

41.     Plaintiffs are informed and believe and thereupon allege that the District Board members knew or should have known that Hull did not have the requisite background to serve in the interim positions to which he was being appointed, that he had been accused of trying to intimidate a Kensington District Board member with his police vehicle, and that he had displayed volatile behavior in his interactions with Kensington citizens.  The Board further knew that many citizens had lodged complaints or allegations of misconduct and intimidation by the Kensington Police Department.  In short, the Kensington District Board members knew or should have known that they were putting Kensington citizens at risk of harm by appointing Hull as the Interim Chief and General Manager.

42.     Between 2014 and the end of 2016, Kensington Police Department Officer Ramos repeatedly warned Saba that Hull was out to get him, and had threatened to obtain a warrant to search his house and shoot him in the course of a search. Saba was fearful for himself and his family, and consequently was contemplating moving out of Kensington. In fact, Saba put his house on the market and found a buyer.  Unfortunately the deal fell through and Saba stayed in Kensington.

43.     On or about January 14, 2016, several weeks after Hull took over as interim Chief

of Police and General Manager, Saba was home with his wife and children, after having been in a car accident earlier in the day.  At some point Saba and his family heard repeated and very loud banging on their courtyard door.  When banging continued, Plaintiff Lin called 911.  Saba went outside, and saw a man running toward him with something in his hand, yelling and cursing. As the man approached, Saba asked the man what he was doing, and didn't he see the "No Trespassing" signs?  The man acted bizarrely, started dancing, and dropped some papers on the ground, walked across the street, and stood there.  Saba went back into his house and called Kensington Police Department Officer Kevin Hui and asked him to come over, as the man was acting very strangely.

44.     Shortly thereafter Officer Ramos arrived at the house. The man stated that he didn't want to go back to jail.  Ramos checked for warrants, and then took the man into his car and drove off to the police station.  Lin had left to go to the store, and Ramos told Saba that after she returned from shopping he and Lin should come to the station to give a statement.

45.     When Lin returned from shopping, they gathered their children and drove down to the station.  When Saba entered the station he saw Ramos, and asked if the man who Ramos had brought to the station was upstairs.  Ramos signaled to Saba that Hull had arrived at the station, and he told Saba that he needed to get in and make a statement and get out – as Hull was "up to something."  Ramos took Saba into another room as Officer Barrow stayed with the rest of his family.

46.     Plaintiffs are informed and believe and thereupon allege that the man that had acted so strangely in front of Plaintiffs' home, had a criminal record and was afraid of being returned to jail, and that once at the police station Defendants used threats and coercion to get him to sign a false statement against his will, accusing Saba of attempting to rob him.  Once he had signed the false written statement, Defendants drove him to the Bart Station and released him.

47.     Once Defendants had the falsified statement, Ramos relayed to Saba his Miranda rights, and Saba – quite surprised – asked if he was being arrested.  Ramos asked Saba if he

understood the Miranda.  Saba said he did not, and Ramos left the room.  Saba then went back

into the room where his wife was sitting with Barrow.  Barrow told Saba that if he spoke to his

wife he would be arrested for "interfering with a witness."  Saba and his family then started

walking outside to go home, and at that point Hull came outside and told Saba to come back

inside because he needed to talk to him.  Saba went back in and Lin continued towards the car.

48.    Once inside the station, Hull told Saba that he was being arrested for robbery and

took him upstairs.  Ramos was there, and Saba asked him what he was being arrested for.

Ramos handed him a printed sheet that listed the charges, which included brandishing a gun and

carrying a sealed weapon.  The charges were entered by Detective Rodney Martinez. Saba asked

Hull to enter his (Saba's) version of what had happened.  Hull did not.

49.    Saba remained at the station for six hours and was then taken to the Contra Costa

jail where he remained for several days. Bail was set at $172,000, requiring Saba to pay $9,450

to a bondsman to get out of jail. Most of the bail amount was based on a felony robbery charge.

50.    The police report of the incident was allegedly prepared by Ramos and signed by

Keith Barrow.  Plaintiffs are informed and believe and thereupon allege that the report was

falsified on Hull's instructions and orders with the specific intent to falsely incriminate Saba, and

ultimately to interfere with the security clearance he had for his work.  Plaintiffs are informed

and believe and thereupon allege that Hull specifically intended to interfere with Saba's ability to

work for certain of his customers for whom a security clearance was needed. Plaintiffs are

informed and believe and thereupon allege that information of Saba's arrest was entered by

Defendants into the CLETS database, thereby ensuring that Saba's name is part of the interstate

database that is utilized by laws enforcement agencies around the nation.

51.    After Saba was arrested, Plaintiffs' home was searched by Officers Barrow and

Foley. The search went on for hours.  Plaintiffs are informed and believe and thereupon allege

that the search was made pursuant to a warrant that relied on false statements by the officers

procuring the warrant, and that the warrant and the search were instigated by Hull and carried out

by Barrow and Foley pursuant to Hull's orders .  During the course of the search, Lin's work

computers were taken and damaged during the time they were held, and valuable information was destroyed or corrupted, interfering with Lin's work and work product, and compromising her ability to work safely and securely.

52.     Plaintiffs are informed and believe and thereupon allege that Hull caused, through means of internet and intra and interstate wire communications, a false and defamatory press release to be issued alleging, among other things, that Saba had pulled a "semi-automatic" hand gun on a "solicitor" who came to Saba' door, and insinuating that there was evidence of a crime in Plaintiffs' home.  There were no guns in Plaintiffs' home at the time of the arrest or at the time of the search of Plaintiffs' home, and there was no evidence of any crime – only the false evidence and charges that had been fabricated by Defendants.

53.     The press release specifically identified Saba, and also disclosed his birthdate. Plaintiffs are informed and believe and thereupon allege that it is not standard practice to release such details in a press release and that such information was released specifically for the purpose of harming and injuring Saba and his family.

54.     The DA investigated the case but never pursued the charges.  However, the existence of the charges has significantly interfered with Saba's ability to work with clients for whom a security clearance is needed.

55.     As a direct and proximate result of the conduct and actions of Defendants, Plaintiffs lost their home and suffered emotional distress, including but not limited to anxiety, fear, embarrassment, humiliation and anger.

## **FIRST CLAIM**
(18 U.S.C. §1961 *et seq.,* RICO Violations)

56.     Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

57.     This claim arises under 18 U.S.C. §1962(a)-(d), which provides in relevant part:

COMPLAINT FOR DAMAGES
SABA v. KENSINGTON, Case No. _____

(b) It shall be unlawful for any **person** through a pattern of **racketeering activity** or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any **person** employed by or associated with any **enterprise** engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such **enterprise**'s affairs through a pattern of **racketeering activity** or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

58.     In engaging in the actions and conduct alleged in this Complaint Defendants Hull, Ramos, Martinez, Barrow, Foley and Does 1-25, through the commission of two or more predicate acts, derived income directly or indirectly from a pattern of racketeering or the collection of an unlawful debt and participated directly or indirectly in activities which affected interstate commerce.   Said enterprise is engaged in and continues to engage in activities which affect interstate commerce through the use of mails and interstate wires, including but not limited to the CLETS databases and internet wires and communications.

59.     In undertaking the aforementioned actions, Defendants, and each of them, conspired to commit, and committed predicate acts under at least the following:

18 USCS §1503 (relating to obstruction of justice)

18 USCS §1510 (relating to obstruction of criminal investigations)

18 USCS §1511 (relating to the obstruction of local law enforcement)

18 USCS §1512 (relating to tampering with a witness, victim,

60.     As a result of the foregoing, Plaintiffs have been injured in their business or property through the use of the racketeering income in an amount to be proven at trial, but not less than $75,000, said damages to be trebled to not less than $225,000 under 18 U.S.C §1964, together with interest and attorneys' fees.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SECOND CLAIM**
(42 U.S.C. 1983 – Violation of 4th Amendment)
(Unreasonable Search And Seizure)
(Saba and Lin Against all Defendants)

61.     Plaintiffs incorporate by reference each and every allegation contained above as though fully set forth herein.

62.     Defendants detained, searched, and arrested Saba and detained and searched Lin and Plaintiffs' home without probable cause and without reasonable or articulable suspicion that either of them had committed a crime.

63.     The acts and omissions of the Defendants, and each of them violated Plaintiffs' rights under the laws and Constitution of the United States, including but not limited to, their right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the United States Constitution.

64.     Defendants' conduct was the proximate cause of harm and damage to Plaintiffs, and by reason of the foregoing alleged acts and conduct Plaintiffs are entitled to damages against the Defendants all according to proof at trial.

65.     The individual Defendants engaged in the aforementioned acts maliciously, callously, oppressively, wantonly, recklessly, fraudulently, with deliberate indifference to the rights allegedly violated, despicably and with evil motive and/or intent, and in disregard of the rights of Plaintiffs.  Plaintiffs are therefore entitled to and do seek punitive damages against the individual Defendants.

WHEREFORE Plaintiffs seek relief in an amount according to proof at trial.

**THIRD CLAIM**
(42 U.S.C. 1983 – Violation of 4th Amendment)
(False Arrest/Imprisonment)
(Saba Against All Defendants)

66.     Plaintiffs incorporate by reference each and every allegation contained above as though fully set forth herein.

67.     Defendants intentionally and unlawfully restrained, detained, arrested and

**15**

confined Saba.

68.     Defendants detained and arrested Saba without probable cause to arrest or sufficient suspicion to detain Saba.

69.     As a result of Defendant's conduct Saba was arrested and confined to the Kensington police station and subsequently to the Contra Costa County Jail.

70.     Defendants' conduct was the proximate cause of harm and damage to Saba and by reason of the foregoing alleged acts and conduct Saba is entitled to damages against Defendants all according to proof at trial.

71.     The individual Defendants engaged in the aforementioned acts maliciously, callously, oppressively, wantonly, recklessly, fraudulently, with deliberate indifference to the rights allegedly violated, despicably and with evil motive and/or intent, and in disregard of the rights of Saba.  Saba is therefore entitled to and does seek punitive damages against the individual Defendants.

WHEREFORE Plaintiff seeks relief in an amount according to proof at trial.

### FOURTH CLAIM
(42 U.S.C. 1983 – 4th Amendment)
(Malicious Prosecution)
(Saba Against All Defendants)

72.     Plaintiffs incorporate by reference each and every allegation contained above as though fully set forth herein.

73.     Defendants caused Saba to be charged with felony crimes.

74.     Saba was forced to hire counsel to defend himself against the false accusations.

75.     The District Attorney declined to prosecute Saba.

76.     The acts and omissions of defendants as described herein constitutes malicious prosecution in violation of Plaintiff's Fourteenth Amendment right to due process of law.

77.     As a proximate result the conduct of the defendants, Plaintiff was damaged

COMPLAINT FOR DAMAGES
SABA v. KENSINGTON, Case No. _____

1   in an amount to be determined by proof at trial.

2         78.    The individual Defendants engaged in the aforementioned acts maliciously,

3   callously, oppressively, wantonly, recklessly, fraudulently, with deliberate indifference to the

4   rights allegedly violated, despicably and with evil motive and/or intent, and in disregard of the

5   rights of Saba.  Saba is therefore entitled to and does seek punitive damages against the

6   individual Defendants.

7         WHEREFORE Plaintiff seeks relief in an amount according to proof at trial.

8   **FIFTH CLAIM**
(State Law - False Arrest and Imprisonment)

9   (Saba Against All Defendants)

10        79.    Plaintiffs incorporate by reference each and every allegation contained above as

11  though fully set forth herein.

12        80.    Defendants intentionally and unlawfully restrained, detained, arrested and

13  confined Saba.

14        81.    Defendants detained and arrested Saba without probable cause to arrest or

15  sufficient suspicion to detain Saba.

16        82.    As a result of Defendant's conduct Saba was arrested and confined to the

17  Kensington police station and subsequently to the Contra Costa County Jail.

18        83.    Defendants' conduct was the proximate cause of harm and damage to Saba and

19  by reason of the foregoing alleged acts and conduct Saba is entitled to damages against

20  Defendants all according to proof at trial.

21        84.    The individual Defendants engaged in the aforementioned acts maliciously,

22  callously, oppressively, wantonly, recklessly, fraudulently, with deliberate indifference to the

23  rights allegedly violated, despicably and with evil motive and/or intent, and in disregard of the

24  rights of Saba.  Saba is therefore entitled to and does seek punitive damages against the

25  individual Defendants.

26        WHEREFORE Plaintiff seeks relief in an amount according to proof at trial.

27

28  **17**

## SIXTH CLAIM
(State Law - Negligent Hiring, Training and Retention)
(Saba and Lin Against Kensington District)

85.     Plaintiffs incorporate by reference each and every allegation contained above as though fully set forth herein.

86.     Plaintiffs are informed and believe and thereon allege, that in doing the acts alleged above, Defendant  knew, or in the exercise of reasonable diligence should have known, that Defendant Hull was incompetent and unfit to perform the duties for which he was employed and that an undue risk to persons such as Plaintiffs would exist because of the employment.

87.     Defendant KENSINGTON DISTRICT, by and through those employees and agents who trained and/or supervised HULL, failed to exercise reasonable care when training and supervising HULL.

88.     As a proximate and direct legal result of Defendant KENSINGTON DISTRICT's negligence as alleged herein, Plaintiffs have suffered the harm alleged in this Complaint, in an amount to be determined at trial, but in excess of the minimum jurisdictional limits of this court

89.     Plaintiffs are informed and believe and thereupon allege that Defendants had advance knowledge of Defendant HULL's propensity for harassment, false reporting, suppression of first amendment rights and retaliation against perceived disobedience or criticism of Hull or the Kensington Police Department, as he has a history of such acts, and the Kensington District knew, or should have known, of such history, which made him unsuitable for employment at Defendant Kensington District.

90.     Despite this advance knowledge, the Kensington District retained Hull as an employee in conscious disregard to the rights and safety of others, and of Plaintiffs.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as herein set forth.

## SEVENTH CLAIM
(State Law - Malicious Prosecution)
(Saba Against All Defendants)

91.     Plaintiffs incorporate by reference each and every allegation contained above as though fully set forth herein.

92.     Defendants caused Saba to be charged with felony crimes.

93.     Saba was forced to hire counsel to defend himself against the false accusations.

94.     The District Attorney declined to prosecute Saba.

95.     The acts and omissions of Defendants as described herein constitutes malicious prosecution in violation of Plaintiff's Fourteenth Amendment right to due process of law.

96.     As a proximate result the conduct of the defendants, Plaintiff was damaged in an amount to be determined by proof at trial.

97.     The individual Defendants engaged in the aforementioned acts maliciously, callously, oppressively, wantonly, recklessly, fraudulently, with deliberate indifference to the rights allegedly violated, despicably and with evil motive and/or intent, and in disregard of the rights of Saba.  Saba is therefore entitled to and does seek punitive damages against the individual Defendants.

WHEREFORE Plaintiff seeks relief in an amount according to proof at trial.

## EIGHTH CLAIM
(State Law - Defamation)
(Saba and Lin Against All Defendants)

98.     Plaintiffs incorporate by reference each and every allegation contained above as though fully set forth herein.

99.     Defendants made statements to the press which accused Plaintiffs of having committed a crime.

100.     Defendants' statements were false.

101.    Defendants' statements caused damage to Plaintiffs.

102.    The individual Defendants engaged in the aforementioned acts maliciously, callously, oppressively, wantonly, recklessly, fraudulently, with deliberate indifference to the rights allegedly violated, despicably and with evil motive and/or intent, and in disregard of the rights of Plaintiffs.  Plaintiffs are therefore entitled to and do seek punitive damages against the individual Defendants.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as herein set forth.

### NINTH CLAIM
(State Law - Intentional Infliction of Emotional Distress)
(Saba and Lin Against All Defendants)

103.    Plaintiffs incorporate by reference each and every allegation contained above as though fully set forth herein.

104.    The conduct of Defendants, as set forth above was extreme and outrageous.  Said conduct was intended to cause severe emotional distress to Plaintiffs.  Hull and Martinez, by falsely arresting and imprisoning Saba and by intentionally humiliating him, conducted themselves in a manner that went beyond all common notions of decency. The individual Defendants engaged in conduct intended to humiliate, embarrass, and instill fear in Saba. The individual Defendants, directly injured Saba by their failure to act in accordance with common notions of fairness and decency.

105.    The foregoing conduct caused Plaintiffs to suffer severe and extreme emotional distress. The individual Defendants' conduct was the proximate cause of harm and damage to Plaintiffs, and by reason of the foregoing alleged acts and conduct Plaintiffs are entitled to damages against the individual Defendants, all according to proof at trial.

106.    The individual Defendants engaged in the aforementioned acts maliciously, callously, oppressively, wantonly, recklessly, fraudulently, with deliberate indifference to the rights allegedly violated, despicably and with evil motive and/or intent, and in disregard of the rights of Plaintiffs. Plaintiffs are therefore entitled to and do seek punitive damages against the

individual Defendants.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as herein set forth.

### **PRAYER**

WHEREFORE, plaintiff prays for judgment against all Defendants, and each of them, as follows:

1.    For a money judgment representing compensatory damages, general damages, special damages, and other sums according to proof at trial;

2.    For a money judgment for mental pain and anguish and emotional distress according to proof at trial;

3.    For punitive damages against the individual Defendants;

4.    For attorney's fees and costs of suit, pursuant to 42 USC 1988;

5.    For prejudgment and post-judgment interest;

6.    For any other remedy that the court deems just and proper.

DATED:  February 5, 2018          GEONETTA & FRUCHT, LLP

By: _____
Kenneth Frucht
Attorneys for Plaintiffs Fadi Saba and Chih Lin

### JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  February 5, 2018          GEONETTA & FRUCT, LLP

By: _____
Kenneth Frucht
Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES
SABA v. KENSINGTON, Case No. _____